**ENVIROCARE OF UTAH, INC., Petitioner,**

v.

**NUCLEAR REGULATORY COMMISSION and United States of America, Respondents.**

---

Quivira Mining Company and International Uranium (USA) Corporation, Intervenors.

Nos. 98–1426 & 98–1592.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1999.

Decided Oct. 22, 1999.

Richard L. Cys argued the cause for petitioner. With him on the briefs was Lynda L. Brothers.

E. Leo Slaggie, Deputy Solicitor, U.S. Nuclear Regulatory Commission, argued the cause for respondents. With him on the brief were Lois J. Schiffer, Assistant Attorney General, U.S. Department of Justice, Robert H. Oakley, Attorney, Karen D. Cyr, General Counsel, U.S. Nuclear Regulatory Commission, and John F. Cordes, Jr., Solicitor. Grace H. Kim, Attorney, entered an appearance.

Anthony J. Thompson, Frederick S. Phillips, David C. Lashway, Mark J. Wet-

terhahn, and Robert M. Rader were on the brief for intervenors.

Before: EDWARDS, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

■ Federal agencies may, and sometimes do, permit persons to intervene in administrative proceedings even though these persons would not have standing to challenge the agency's final action in federal court. Agencies, of course, are not constrained by Article III of the Constitution; nor are they governed by judicially-created standing doctrines restricting access to the federal courts. The criteria for establishing "administrative standing" therefore may permissibly be less demanding than the criteria for "judicial standing." *See, e.g., Pittsburgh & W.Va. Ry. v. United States,* 281 U.S. 479, 486, 50 S.Ct. 378, 74 L.Ed. 980 (1930); *Alexander Sprunt & Son, Inc. v. United States,* 281 U.S. 249, 255, 50 S.Ct. 315, 74 L.Ed. 832 (1930); HENRY J. FRIENDLY, FEDERAL JURISDICTION: A GENERAL VIEW 118 (1973).[1]

Is the converse true? May an agency refuse to grant a hearing to persons who would satisfy the criteria for judicial standing and refuse to allow them to intervene in administrative proceedings? This is the ultimate question posed in these consolidated petitions for judicial review of two orders of the Nuclear Regulatory Commission refusing to grant Envirocare of Utah, Inc.'s requests for a hearing and for intervention in licensing proceedings.

1. As Judge Friendly observed:
 The need for a "case or controversy" to seek judicial review but not to intervene in an administrative hearing; the differences between statutes and agency rules controlling intervention and statutes controlling judicial review; and the differing characters of administrative and judicial proceedings—all of these negate any general rule linking a person's standing to seek judicial

## I

Envirocare was the first commercial facility in the nation the Commission licensed to dispose of certain radioactive byproduct material from offsite sources.[2] The Commission had licensed other companies to dispose of such radioactive waste, but only if the waste was produced onsite. In the late 1990s, the Commission granted the applications of two such companies for amended licenses to allow them to dispose of radioactive waste received from other sites. International Uranium (USA) Corporation's facility in Utah became licensed to receive and dispose of approximately 25,000 dry tons of waste still remaining from the Manhattan Project and currently stored in New York State. Quivira Mining Company's facility in New Mexico, some 500 miles from Envirocare's operation, also became licensed to dispose of specified amounts of such material from offsite sources.

In both licensing proceedings before the Atomic Safety and Licensing Board, Envirocare requested a hearing and sought leave to intervene to oppose the amendment. Envirocare's basic complaint was "that the license amendment permits [the company] to become a general commercial facility like Envirocare, but that the NRC did not require [the company] to meet the same regulatory standards the agency imposed upon Envirocare when Envirocare sought *its* license to become a commercial disposal facility for" radioactive waste. *Quivira Mining Co.,* 48 N.R.C. 1, 4 (1998). The Licensing Board rejected Envirocare's requests for a hearing and for leave to intervene in both cases, and in separate

review to the fact that he has been allowed to intervene before the agency.
 *Id.* (citing 3 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 22.08, at 241 (1958)).

2. The material consists of waste resulting from "the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." 42 U.S.C. § 2014(e)(2).

opinions several months apart, the Commission affirmed.

With respect to the proceedings to amend Quivira's license, the Commission ruled that Envirocare did not come within the following "standing" provision in the Atomic Energy Act: when the Commission institutes a proceeding for the granting or amending of a license, "the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding." 42 U.S.C. § 2239(a)(1)(A). In determining whether Envirocare possessed the requisite "interest" under this provision, the Commission looked to "current judicial concepts of standing." *Quivira Mining Co.*, 48 N.R.C. at 6. Envirocare alleged economic injury, claiming that the less stringent application of regulations to Quivira placed Envirocare at a competitive disadvantage. This allegation was sufficient, the Commission held, to meet the injury-in-fact requirements of constitutional standing. On the question of prudential standing, however, the Commission determined that "Envirocare's purely competitive interests, unrelated to any radiological harm to itself, do not bring it within the zone of interests of the AEA for the purpose of policing the license requirements of a competitor." *Id.* at 16.

With respect to International Uranium's license, the Commission agreed with the Licensing Board that the case was "on all fours" with *Quivira*. *International Uranium Corp.*, 48 N.R.C. 259, 261 (1998). As in that case, Envirocare's injury from International Uranium's competition was not within the Atomic Energy Act's zone of interests. In addition, the Commission made explicit its view that judicial standing doctrines were not controlling in the administrative context and that its duty was to interpret the "interest[s]" Congress intended to recognize in § 2239(a)(1)(A): "Our understanding of the AEA requires us to insist that a competitor's pecuniary aim of imposing additional regulatory restrictions or burdens on fellow market participants does not fall within those 'interests' that trigger a right to hearing and intervention under [§ 2239(a)(1)(A) ]." *International Uranium Corp.*, 48 N.R.C. at 264.

II

Envirocare spends all of its time arguing that in light of decisions of the Supreme Court and of this court, its status as a competitor satisfies the "zone of interests" test for standing, as the test was formulated in *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and as it was refined in *National Credit Union Administration v. First National Bank & Trust Co.*, 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). We shall assume that Envirocare is correct. It does not follow that the Commission erred in refusing the company's motions for a hearing and for leave to intervene, at least in regard to International Uranium's license amendment. The Commission rightly pointed out, in *International Uranium* and in *Quivira*, that it is not an Article III court and thus is not bound to follow the law of standing derived from the "case or controversy" requirement. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Judicially-devised prudential standing requirements, of which the "zone of interests" test is one, are also inapplicable to an administrative agency acting within the jurisdiction Congress assigned to it. The doctrine of prudential standing, like that derived from the Constitution, rests on considerations "about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ Whether the Commission erred in excluding Envirocare from participating in International Uranium's licensing proceeding therefore turns not on judicial decisions dealing with standing to sue, but on familiar principles of administrative law

regarding an agency's interpretation of the statutes it alone administers. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The governing provision—42 U.S.C. § 2239(a)(1)(A)—requires the Commission to hold a hearing "on the request of any person whose interest may be affected by the proceeding" and to allow such a person to intervene.[3] The term "interest" is not defined in the Act and it is scarcely self-defining. It could mean merely an academic or organizational interest in a problem or subject, as in *Sierra Club v. Morton*, 405 U.S. 727, 738–40, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Or an interest in avoiding economic harm or in gaining an economic benefit from agency action directed at others. *See Association of Data Processing Serv. Orgs.*, 397 U.S. at 154, 90 S.Ct. 827. Or an "interest" in "aesthetic, conservational and recreational values." *Id.* Or all of these. But whatever the judicial mind thinks of today as an "interest" affected by a proceeding is not necessarily what Congress meant when it enacted this provision in 1954. At the time, judicial notions of standing were considerably more restrictive than they are now. The Supreme Court had put it this way: a private party could challenge federal government action in federal court only if the party had a legally protected interest, that is, "one of property, one arising out of contract, one protected against tortious invasion or one founded on a statute which confers a privilege." *Tennessee Elec. Power Co. v. TVA*, 306 U.S. 118, 137–38, 59 S.Ct. 366, 83 L.Ed. 543 (1939); *see also* STEPHEN G. BREYER & RICHARD B. STEWART, ADMINISTRATIVE LAW AND REGULATORY POLICY: PROBLEMS, TEXT, AND CASES 1195–96 (2d ed.1985). Thus, traders in one market were not "parties in interest" entitled to sue for an injunction against a railroad's extending its track to a competitive market. *L. Singer & Sons v. Union Pac. R.R.*, 311 U.S. 295, 61 S.Ct. 254, 85 L.Ed. 198 (1940). On the other hand, some Supreme Court opinions pointed in the opposite direction, recognizing judicial standing for competitors who would suffer economic injury from agency action. An example is *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). Another is *The Chicago Junction Case*, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924). How agencies were then treating standing questions is unclear. According to one report, they were limiting the right to a hearing "to those directly subject to administrative controls, exactions or sanctions," BREYER & STEWART, *supra*, at 1186. Even after *Sanders Brothers*, the FCC did not recognize "economic injury" as "sufficient to secure a hearing or to intervene in a hearing on a competitor's license application." RONALD A. CASS & COLIN S. DIVER, ADMINISTRATIVE LAW: CASES AND MATERIALS 714 (1987) (citing *Voice of Cullman*, 14 F.C.C. 770 (1950)). It was not until the late 1950s that some decisions of this court began expanding the category of persons entitled to participate in agency proceedings on the theory that anyone who had standing to seek judicial review should have adminis-

---

**3.** Although it appears that the Administrative Procedure Act applies to the Nuclear Regulatory Commission, *see* 42 U.S.C. § 2231, Envirocare has not invoked the APA's administrative standing provision, which reads: "So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request or controversy in a proceeding." 5 U.S.C. § 555(b).

Commentators have noted that the role of § 555(b) is unclear and very few courts have attempted to delineate its scope. *See* 3 KEN-NETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 16.10, at 63–65 (3d ed.1994). One scholar, relying on the prefatory language of the provision, argues that § 555(b) does not create "an absolute, or even a conditional, right to be a party." David L. Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators*, 81 HARV. L.REV. 721, 766 (1968). We express no view on whether § 555(b) would bring about a result different than the one reached by the Commission in its *International Uranium* opinion interpreting § 2239(a)(1)(A). *See infra* note 7.

trative standing. *See, e.g., National Welfare Rights Org. v. Finch,* 429 F.2d 725, 732–33 (D.C.Cir.1970); *Office of Communication of United Church of Christ v. FCC,* 359 F.2d 994, 1000–06 (D.C.Cir.1966); *Virginia Petroleum Jobbers Ass'n v. FPC,* 265 F.2d 364 (D.C.Cir.1959).[4] (We will have more to say about these cases in a moment.)

Because we cannot be confident of what kinds of interests the 1954 Congress meant to recognize in § 2239(a)(1)(A)—because, in other words, the statute is ambiguous—the Commission's interpretation of this provision must be sustained if it is reasonable. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. We think it is. For one thing, excluding competitors who allege only economic injury from the class of persons entitled to intervene in licensing proceedings is consistent with the Atomic Energy Act. The Act meant to increase private competition in the industry, not limit it. Before its passage in 1954, the federal government completely controlled nuclear energy. Through the Act, Congress sought to foster a private nuclear industry for peaceful purposes. In order to ensure that private industry would not undermine nuclear safety, the Act created an agency—what is today the Nuclear Regulatory Commission—to regulate the private sector. *See generally Pacific Gas & Elec. v. State Energy Resources Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). One of the Commission's statutory duties is authorizing the transfer and receipt of radioactive byproduct material. *See* 42 U.S.C. § 2111. The statute describes the Commission's responsibility in this area as follows: "The Commission shall insure that the management of any byproduct material ... is carried out in such a manner as the Commission deems appropriate to protect the public

health and safety and the environment from radiological and nonradiological hazards associated with the processing and with the possession and transfer of such material...." 42 U.S.C. § 2114(a)(1).

Nothing in this provision, or in the rest of the Act, indicates that the license requirement was intended to protect market participants from new entrants. Envirocare points to the Act's policy statement which mentions "strengthen[ing] free competition in private enterprise." Petitioner's Initial Brief at 25 (citing 42 U.S.C. § 2011). This statement refers to the Act's goal of creating a private nuclear energy industry. Allowing new competitors to enter the market strengthens competition. Permitting current license holders to initiate hearings for the purpose of imposing burdens on potential competitors does the opposite. *See* Lars Noah, *Sham Petitioning as a Threat to the Integrity of the Regulatory Process,* 74 N.C. L.Rev. 1 (1995).

In rendering its interpretation of § 2239(a)(1)(A), the Commission also properly took account of regulatory burdens on the agency. It wrote: "Competitors, though, whose only 'interest' is lost business opportunities, could readily burden our adjudicatory process with open-ended allegations designed not to advance public health and safety but as a dilatory tactic to interfere with and impose costs upon a competitor. Such an abuse of our hearing process would significantly divert limited agency resources, which ought to be squarely—genuinely—focused upon health and safety concerns." *International Uranium,* 48 N.R.C. at 265. The Commission's concerns are not limited to byproduct disposal licenses. Those are only one of the many types of licenses the Commission grants. Within the Commission's au-

---

**4.** We are not sure that *Martin–Trigona v. Federal Reserve Bd.,* 509 F.2d 363 (D.C.Cir.1975), is such a case. While the court stated that the tests for judicial standing and administrative standing would be treated as identical "[f]or purposes of this case," *id.* at 366, this appears to have been a decisional device. The court's holding was that petitioner had alleged no injury in fact and therefore did not have standing of any sort. *Id.* at 367; *see also id.* at 366 n. 10.

thority are licenses for the distribution of special nuclear material, *see* 42 U.S.C. § 2073, for the transfer and distribution of nuclear source material, *see id.* §§ 2092, 2093, for commercial uses of nuclear material, *see id.* § 2133, and for medical therapy that uses nuclear material, *see id.* § 2134(a).

For these reasons, the view the Commission expressed in its *International Uranium* opinion—that competitors asserting economic injury do not demonstrate the type of interest necessary under § 2239(a)(1)(A)—is a permissible construction of the statute.[5] And it appears to be a construction the Commission has adhered to for some time. *See Virginia Elec. & Power Co.*, 4 N.R.C. 98, 105–06 (1976). The Commission stated that it has long been its practice to deny requests for a hearing under § 2239(a)(1)(A) when the petitioner alleged only economic injury. *See International Uranium*, 48 N.R.C. at 265. Envirocare has cited nothing to the contrary. In any event, even if the Commission's refusal to follow the developing law of judicial standing had been a departure from its usual practice, it gave adequate reasons for changing course.

■ We mentioned earlier several decisions of this court indicating that agencies should allow administrative standing to those who can meet judicial standing requirements: *National Welfare Rights Organization v. Finch*, 429 F.2d 725, 732 (D.C.Cir.1970); *Office of Communication of United Church of Christ v. FCC*, 359 F.2d 994, 1000–06 (D.C.Cir.1966); *Virginia Petroleum Jobbers Association v. FPC*, 265 F.2d 364 (D.C.Cir.1959).[6] None of these cases interpreted the administrative standing provision of the Atomic Energy Act. All were decided before *Chevron* and for that reason alone cannot control our decision today. Furthermore, despite some broad language in *Office of Communication* about administrative standing, the agency there equated standing to appear before it with standing to obtain judicial review and so the court had no occasion to examine whether the two concepts might be distinct. *See* 359 F.2d at 1000 n. 8. In *National Welfare Rights* no statute gave individuals standing to intervene in agency proceedings to cut off federal grants-in-aid to states under the Social Security Act. Regardless of the agency's view that only states could participate in the administrative proceedings, which is what the statute said, the court ordered the agency to follow principles of judicial standing in order to "perfect[ ] the right to review." 429 F.2d at 737. This mode of decisionmaking is contrary to the Supreme Court's later decision in *Vermont Yankee* prohibiting the judiciary from imposing procedures on an agency when a statute does not require them. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 543–49, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). As to *Virginia Petroleum Jobbers*, the court there equated standing to intervene in agency proceedings with standing to seek judicial review on the basis that "the right to appeal from an order presupposes participation in the proceedings which led to it," 265 F.2d at 368, a proposition that has since been vigorously disputed. *See* Louis L. Jaffe, Judicial Control of Administrative Action 524–25 (1965); Louis L. Jaffe, *Judicial Review of Procedural Decisions and the* Philco *Cases: Plus Ça Change?*,

---

**5.** The Commission's interpretation does not leave competitors without any opportunity to make their views known in another's licensing proceeding. As the Commission pointed out, any person is allowed to participate in the written petition process, *see* 10 C.F.R. § 2.206, and competitors can participate in ongoing adjudications as amici. *See International Uranium*, 48 N.R.C. at 265–66.

**6.** At least one member of this court questioned these decisions even before *Chevron*. *See Koniag, Inc., Village of Uyak v. Andrus*, 580 F.2d 601, 613 & n. 5 (D.C.Cir.1978) (Bazelon, J., concurring).

50 GEO. L.J. 661, 669 (1960). In any event, as we have said, all of these cases were pre-*Chevron*. Judged by current law, none gave sufficient weight to the agency's interpretation of the statute governing intervention in its administrative proceedings.[7]

■■ This brings us to the Commission's order in *Quivira*. The Commission in that case appeared to reject Envirocare's petition entirely on the basis of its reading of judicial standing doctrine. The opinion did not purport to rest on the interpretation of § 2239(a)(1)(A) it expressed a few months later in the *International Uranium* case. The Commission did, however, give notice that although it "customarily follows judicial concepts of standing, we are not bound to do so given that we are not an Article III court." *Quivira*, 48 N.R.C. at 6 n. 2. Whether in *Quivira* the Commission correctly analyzed the Supreme Court's *National Credit Union* decision regarding the "zone-of-interest" test or our opinion in *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277 (D.C.Cir.1988), or any of the other judicial opinions it discussed, is an issue we do not decide. If we did decide the question and if we concluded that the Commission's analysis was incorrect, we would set aside its order and remand the case. On remand, the Commission could— and undoubtedly would—simply cite our holding in the *International Uranium* case and again deny Envirocare's request for a hearing and for leave to intervene. When "there is not the slightest uncertainty as to the outcome of a proceeding" on remand, courts can affirm an agency decision on grounds other than those provided in the agency decision. *N.L.R.B. v. Wyman–Gordon*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *see also Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1489 (D.C.Cir.1995). As Judge Friendly explained, reversal and remand is "necessary only when the reviewing court concludes that there is a significant chance that but for the error the agency might have reached a different result. In the absence of such a possibility, affirmance entails neither an improper judicial invasion of the administrative province nor a dispensation of the agency from its normal responsibility." Henry J. Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 DUKE L.J. 199, 211. With respect to the *Quivira* case, concerns about judicial intrusion and agency abdication are especially unwarranted. It is the Commission's reasoning, in *International Uranium*, that we accept as the ground upon which to dispose of the petition for review in *Quivira*.

*The petitions for judicial review are denied.*

---

**7.** Our post-*Chevron* opinion in *Nichols v. Board of Trustees of the Asbestos Workers Local 24 Pension Plan*, 835 F.2d 881, 896 (D.C.Cir.1987), did state: "Because a party entitled to judicial review of agency action clearly qualifies as an 'interested person' who normally may intervene in administrative proceedings, we hold that [petitioner] possessed such status under [§ 555(b) of the APA] when he requested permission to participate in the proceedings under review." Whether the meaning of "interested person" in § 555(b) was contested is unclear (*see id.* at 897–98), nor are we certain what the court meant by the qualifier "normally" in the quoted sentence. At any rate, when it comes to statutes administered by several different agencies— statutes, that is, like the APA and unlike the standing provision of the Atomic Energy Act—courts do not defer to any one agency's particular interpretation. *See Tax Analysts v. IRS*, 117 F.3d 607, 613 (D.C.Cir.1997).