**PRESERVATION OF LOS OLIVOS, et al., Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF the INTERIOR, et al., Defendants.**

**Case No. CV 06–1502 AHM (CTx).**

United States District Court, C.D. California, Western Division.

July 8, 2008.

John M. Rochefort, Lisa Gilford, Alston and Bird LLP, Los Angeles, CA, for Plaintiff.

Judith Rabinowitz, U.S. Department of Justice, Roger J. Marzulla, Marzulla Law, Washington, DC, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

A. HOWARD MATZ, District Judge.

## I. INTRODUCTION

Plaintiffs Preservation of Los Olivos ("POLO") and Preservation of Santa Ynez ("POSY") are two citizen groups from the Santa Ynez Valley region of California. They filed this action seeking review of two orders of defendant Department of the

Interior, Interior Board of Indian Appeals (IBIA): one dated February 3, 2006 and one dated June 29, 2007 (collectively, "the IBIA Order"). In those orders the IBIA held that Plaintiffs lack standing to challenge the decision of the Bureau of Indian Affairs ("BIA") to approve the application of the Santa Ynez Band of Chumash Mission Indians ("Tribe") to have 6.9 acres of land taken into federal trust. Plaintiffs seek a declaratory judgment that the IBIA erred in dismissing their administrative appeal. They also seek injunctive relief precluding defendants from enforcing a BIA Order dated January 14, 2005, which approved the application, until the IBIA has reviewed the merits of that appeal.

Plaintiffs have filed a motion for summary judgment on their First Amended Complaint. Their motion requests the Court to reverse and vacate the IBIA Order and to direct the IBIA to issue an order granting them standing to pursue their administrative appeal.

For the reasons stated below, the Court GRANTS–IN–PART and DENIES–IN–PART Plaintiffs' motion for summary judgment. The Court VACATES the IBIA Order and REMANDS this case to the IBIA for consideration of Plaintiffs' standing under the principles set forth in this ruling. Specifically, the IBIA must articulate its reasons (functional, statutory, or otherwise) for its determination of standing, taking into account the distinction between administrative and judicial standing and the regulations governing administrative appeals.

## II. BACKGROUND

### A. Factual Background

The Tribe is the only federally recognized Chumash Tribe in the United States. Today, it occupies the Santa Ynez Indian Reservation, located in Santa Barbara County. Of the 139 acres of the Reservation, about 100 acres are developed, containing residential housing, the tribal center, a health center, and a casino, while the remaining acreage is unsuitable for development. *Santa Ynez Valley Concerned Citizens v. Pac. Reg'l Dir.*, BIA, 42 BIA 189, 190 (Feb. 3, 2006) (*"Santa Ynez I"*).

On November 8, 2000, the Tribe submitted an application to the BIA asking it to take into trust 6.9 acres of land contiguous to the Reservation. Trust status for the land would make Indian property on the land immune to taxation by state or local governments unless expressly authorized by Congress. *See Oklahoma Tax Comm'n v. Sac and Fox Nation*, 508 U.S. 114, 128, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993) (holding that states do not have jurisdiction to tax tribal members who live and work in Indian country, whether the particular territory consists of a formal or informal reservation, allotted lands, or dependent Indian communities, absent explicit congressional direction to the contrary).

The regulation that implements the Indian Reorganization Act's ("IRA") provisions concerning trust acquisitions, 25 C.F.R. Part 151, provides that the Secretary of the Interior may take land into trust for a tribe "(1) when the property is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area; or (2) when the tribe already owns an interest in the land; or (3) when the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing." 25 C.F.R. § 151.3.

In its initial application, the Tribe proposed to develop the 6.9 acres as a tribal administration and community center. After the remains of a Chumash burial site and intact Chumash village were discovered on the property, the Tribe revised its trust application. Its revised application

proposed (1) a cultural center and museum, (2) a 3.5 acre commemorative park that would focus on the history of the Chumash people and act as a preservation buffer for the archeological site, and (3) a 27,600–square foot, two-story commercial retail building that would help generate revenues for the upkeep of the cultural center, museum and park. *Santa Ynez I* at 190–91, 200. The BIA issued a public notice of the trust application and solicited comments from various local and state government offices. Certified Administrative Record ("AR") 4134.

■ As required by the National Environmental Policy Act ("NEPA"), the BIA assessed the environmental impact of taking the land into trust. NEPA requires a federal agency to prepare a detailed Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Federal regulations permit an agency that is planning a major federal action to conduct a less exhaustive Environmental Assessment (EA) beforehand, in order to determine whether the proposed action will "significantly affect" the environment so as to require an EIS in the first place. 40 C.F.R. §§ 1501.4(b), 1508.9. If the EA shows that the proposed action will have no significant impact, "the agency may issue a finding of no significant impact ('FONSI') and then execute the action." *Sierra Club v. Babbitt,* 65 F.3d 1502, 1505 (9th Cir.1995); *see also* 40 C.F.R. §§ 1508.9, 1508.13.

The BIA conducted a Phase I Contaminant Survey. *Santa Ynez I,* 42 IBIA at 191. The survey noted that the property is adjacent to a fuel service station that is a listed Leaking Underground Storage Take ("LUST") site. However, relying on a November 2001 report, the survey noted that soil and groundwater testing indicated that the contamination posed no immediate threat to the Property. Hence, the survey

found no hazardous substances on the Property. The Tribe prepared an EA, which the BIA adopted and disseminated for public comment. Based on the EA, on September 22, 2004 the BIA issued a FONSI, finding that the decision to take the land into trust would have no significant impact on the environment and that the preparation of an EIS was unnecessary. *Santa Ynez I,* 42 IBIA at 191. The finding of no significant impact was also circulated for public review.

On January 14, 2005, the BIA approved the Tribe's trust application. In its Notice of Decision, the BIA Pacific Regional Office reviewed in summary fashion the comments it had received on the trust application. AR 4134–4235. Then the BIA decision reviewed the factors set forth in 25 C.F.R. § 151.10 for evaluating a trust application. AR 4135–4139. Specifically, the BIA considered (1) the need of the Tribe for additional land; (2) the purposes for which the land will be used; (3) the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls; (4) jurisdictional problems and potential conflicts of land use which may arise; (5) whether the BIA is equipped to discharge the additional responsibilities resulting from the acquisition of land in trust status; and (6) whether or not contaminants or hazardous substances may be present on the property. AR 4135.

The BIA also reviewed the steps it had taken to comply with NEPA, namely the preparation and circulation of the EA and the FONSI. AR 4139. Finally, in the conclusion section of the Notice, the BIA referred to an enclosed list of entities to which it was sending the notice. AR4140. It stated: "Should any of the below listed known interested parties feel adversely affected by this decision, an appeal may be filed ... in accordance with the regula-

tions in 43 CFR 4.310–4.340 (copy enclosed)." *Id.*

## B. The IBIA Appeal

On February 22, 2005, Plaintiffs POLO and POSY, along with two other organizations that are not parties here[1] filed a "Notice of Appeal" of the BIA's decision.

The appeal requested that the IBIA vacate the BIA decision to take the property into trust and remand the matter to the Pacific Regional Director. The appellants included a "Statement of Reasons" that set forth their grounds for appeal, namely: (1) the BIA's decision failed to comply with NEPA because its decision was based on an inadequate Environmental Assessment prepared by the Tribe, and a comprehensive environmental impact statement was required; (2) the BIA failed to consider all facts in its analysis of the factors for on-reservation acquisitions set forth in 25 C.F.R. § 151.10; (3) the BIA failed to address the potential gaming uses of the land and the applicability of 25 U.S.C. § 2719, which the Tribe initially cited as authority for this trust acquisition[2]; and (4) the BIA's failure to comply with 25 C.F.R. Part 151 was arbitrary and capricious. (First Am. Compl., Ex. E.)

The Regional Director and the Tribe moved to dismiss the appeal, arguing that the Appellants lacked standing. In opposition to that motion, Plaintiffs relied on the declarations of nine individuals who were members of POLO or POSY: Doug Herthel, Kathryn Cleary, S. Chris Rheinschild, Michelle Griffoul, Michael Byrne, Keith Saarloos, Zoe Carter, Ed Hamer, and Jon Bowen, as well as a supplemental declaration from Doug Herthel. Reply, Exs. 1, 2 (AR 2300–2301, 2597–2602, 2605–2607, 2609–2616).

Doug Herthel's supplemental declaration provided information about the declarants' membership in POLO and POSY. Herthel, the president of POLO, stated that Bowen, Rheinschild, Cleary, Griffoul, Saarloos, Hamer, Byrne, and Carter were members of POLO at the time they signed their declarations. Herthel Supp. Decl. ¶¶ 2, 7. He further stated that Bowen was President of POSY.[3] *Id.* ¶ 7.

POLO and POSY allege both economic and noneconomic injury-in-fact. As to noneconomic injuries, a number of declarants expressed concern about the negative effects on air quality, traffic and crime following the construction of the Tribe's existing casino. (*See* Cleary, Carter, Byrne, Hamer, Griffoul, Saarloos, and Rheinschild Declarations.) In addition, a number of declarants expressed concern about soil and water quality as a result of existing development on Tribe land. (*See* Herthel, Cleary, Carter, Byrne, Griffoul, Saarloos, and Rheinschild Declarations.) Furthermore, some declarants claimed that their water supply is threatened by MTBE contamination from the LUST site because they live within 3.5 miles, five miles, and in one declarant's case, one mile of the subject property. Byrne Decl. ¶ 1; Griffoul Decl. ¶ 1; Hamer Decl. ¶ 1; Saarloos Decl. ¶ 1 (AR 2605–07, 2614–16). Finally, one

---

**1.** The other administrative appellants were Santa Ynez Valley Concerned Citizens and Women's Environmental Watch of the Santa Ynez Valley.

**2.** 25 U.S.C. § 2719 prohibits the use of off-reservation land taken into trust for gaming uses.

**3.** Although Bowen's own declaration does not state his association with POSY, Federal De-

fendants did not dispute that Plaintiffs have made a sufficient showing that one of the declarants was a *bona fide* member of POSY. Although Plaintiffs did not cite to it here, the IBIA acknowledged in its decision on remand that Bowen had filed a declaration dated April 18, 2007 attesting that he is the President of POSY. 45 IBIA 116 n. 20.

declarant expressed general concerns about the aesthetic impact of the proposed development. Bowen Decl. ¶ 9 (AR 2612).

After considering these declarations, on February 8, 2006, the IBIA dismissed Plaintiffs' appeal for lack of standing. The IBIA first noted: "Although the Board is not bound by the case or controversy requirement of Article III of the U.S. Constitution, as a matter of prudence, the Board generally limits its jurisdiction to cases in which the appellant can show standing." *Santa Ynez I*, 42 IBIA at 192 (citing *Citizens for Safety and Environment v. Acting Northwest Reg'l Dir.*, 40 IBIA 87, 92 (2004)). It then set forth the requirements for Article III standing and prudential standing under federal judicial precedent. *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Applying those standards to the case, the IBIA first eliminated from consideration those declarants who had not identified their membership affiliation with any of the appellant organizations. *Id.* at 193. It then noted that none of the declarants was identified as a member of POSY or Women's Environmental Watch, and that therefore those two organizations had failed to establish their standing.

As to the remaining declarants the IBIA concluded that most of the declarants who had identified themselves as members of POLO and Concerned Citizens had not established "injury in fact," because their complaints regarding the impact of the development on the quality of life were too generalized and their complaints of contamination of the water supply from gasoline and MTBE were too conjectural and hypothetical. *Santa Ynez I*, 42 IBIA at 194–95.

The IBIA assumed for the purpose of further analysis that certain declarants alleged sufficiently concrete and particularized injuries. *Id.* at 196. The IBIA assumed that Elizabeth Newham, Michael De Witt and Eleanor De Witt[4] alleged sufficient environmental injuries because Newham lived three houses away from the Property and the De Witts lived 10 yards away, so they would be affected by the increased traffic, noise, and pollution. *Id.* at 196–97. The IBIA concluded that these declarants did not meet the causation and redressability requirements, however, because the Tribe's development "could almost certainly proceed whether or not the Property is taken into trust." *Id.* at 199. Even if the Tribe's development were subject to state and local regulatory procedures it was mere speculation that a favorable court decision would lead to additional regulatory restrictions that would enable these declarants to avoid injury. *Id.* at 200–01.

The IBIA also assumed that Jon Bowen and Michele Hinnrichs, business owners, alleged sufficient economic injury. *Santa Ynez I*, 42 IBIA at 198–99, The IBIA did not address causation and redressability with respect to these two declarants specifically. Instead, the Board found that they lacked prudential standing. Purely economic injuries, the Board noted, are not within the zone of interests of NEPA. Moreover, their economic injuries are not within the zone of interests protected by 25 C.F.R. § 151.10, the regulation implementing the trust acquisition provision of the Indian Reorganization Act. *Santa Ynez I*, 42 IBIA at 202. Even considering the relaxed nature of the zone of interests test, the Board stated, the economic interests of non-Indian individuals and private busi-

---

4. They were members of Concerned Citizens, one of the administrative appellants that did not join in this federal action.

nesses "are unrelated to and inconsistent with the purposes of the regulations at 25 C.F.R. § 151.10 and the statutory provision they implement, 25 U.S.C. § 465." *Id.*

After the IBIA dismissed the appeal, POLO and POSY filed this action, seeking review of the IBIA's decision under the Administrative Procedure Act ("APA") and the Declaratory Judgment Act.

### C. Procedural Background of This Federal Action

Shortly after this action was filed, the Court granted the Tribe's motion to intervene in this action. On September 25, 2006, the Federal Defendants sought a voluntary remand back to the IBIA because the BIA had inadvertently omitted documents from the administrative record transmitted to the IBIA. On October 6, 2006, the Court remanded this matter to the IBIA for the limited purpose of allowing it to reconsider its decision regarding Plaintiffs' standing in light of the documents that were inadvertently omitted. Those documents consisted primarily of public comment letters concerning the fee-to-trust application and architectural and archeological reports about the proposed development site. The IBIA allowed briefing on the limited issue of whether the additional documents warranted reversal of its decision regarding standing.

On July 29, 2007, the IBIA again dismissed Plaintiffs' appeal for lack of standing. In doing so, it declined to consider arguments that were or could have been raised in the earlier proceedings but were not. *Santa Ynez Valley Concerned Citizens v. Pacific Reg'l Dir.*, 45 IBIA 98, 99 (Jul. 29, 2007) ("*Santa Ynez II*"). With respect to the public comment letters in the supplemental record, the IBIA rejected Appellants' argument that their members have standing because they represent widespread public opinion. *Id.* at 107.

The IBIA also held that nothing in the supplemental record provided a basis to reverse its conclusion that Bowen lacked prudential standing. Finally, the IBIA rejected the notion that Plaintiffs' participation in the BIA's notice-and-comment process affected their legal standing to challenge the BIA's decision, stating;

> Even if the Regional Director actually solicited and considered the public comment letters contained in the record with respect to the fee-to-trust regulatory factors, it would not follow that private individual interests are within the zone of interests created by the statute or regulations. The Regional Director cannot create legal standing under a statute or regulation where it does not otherwise exist. *See Hall v. Great Plains Regional Director*, 43 IBIA 39, 45–46 (2006). It may well be within the discretion of BIA to consider comments from private individuals on the regulatory fee-to-trust factors, but the fact of doing so does not bring those individuals within the legal zone of interests of the statute or regulations. *Cf. id.* (whether or not BIA refers to potentially affected individuals as "interested parties" does not affect whether they in fact have legal standing to challenge a decision.); *Consolidated Edison Co. of New York v. O'Leary*, 131 F.3d 1475, 1481 (Fed.Cir. 1997) (agency may permit parties to participate in administrative proceedings without creating a right of judicial review).

*Santa Ynez II*, 45 IBIA 98, at 116.

Thereafter, Plaintiffs filed a First Amended Complaint ("FAC") in this action.

In this motion, Plaintiffs seek summary judgement from the Court that they do have standing to pursue their administrative appeal. Federal Defendants seek affirmance of the IBIA's ruling that Plain-

tiffs lack standing. On May 13, 2008, after their respective papers were filed, the Court ordered supplemental briefing on whether it was improper for the IBIA to assess standing under principles of judicial, as opposed to administrative, standing. In their response to that order, Federal Defendants raised a challenge to this Court's jurisdiction. The Court now turns to that threshold issue.

## III. PLAINTIFFS' STANDING IN FEDERAL COURT

■ Federal Defendants argue that the Court cannot evaluate the IBIA's decision concerning Plaintiffs' administrative standing without first addressing its own Article III jurisdiction to consider Plaintiffs' judicial challenge. Their position is that Plaintiffs lack judicial standing (for the reasons set forth in Federal Defendants' original opposition brief), and therefore the Court lacks subject matter jurisdiction. This contention betrays a conceptual confusion between this Court's jurisdiction and Plaintiffs' standing. The Court certainly does not lack jurisdiction to evaluate whether Plaintiffs have the requisite standing to seek judicial review of the IBIA's decision. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). Thus the Court construes Federal Defendants' so-called jurisdictional challenge to be a challenge to Plaintiffs' standing to bring this federal action. As to that issue, Plaintiffs unquestionably do have standing to seek review of the IBIA Order, as the following analysis demonstrates.

## A. Principles of Judicial Standing

■ The standing inquiry focuses on whether a party has a sufficient stake in the outcome of a controversy to obtain judicial resolution of that controversy. *Sierra Club v. Morton*, 405 U.S. 727, 731, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The party invoking federal jurisdiction bears the burden of establishing the requirements for standing as to each claim she seeks to press. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006).

■ Standing has two components, constitutional and prudential.[5] To demonstrate standing under Article III's case-or-controversy requirement, Plaintiffs must show: (1) they have suffered an injury in fact, which is concrete and particularized and actual or imminent; (2) the injury is "fairly traceable" to the IBIA's refusal to hear their appeal; and (3) the injury will likely be redressed by a favorable decision from this Court. *Nuclear Info. & Resource Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 949 (9th Cir.2006); *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (1992). Prudential standing under the APA requires: (1) a final agency action; and (2) an injury falling within the "zone of interests" protected by the statutory provision the plaintiff claims was violated. *Nuclear Info.*, 457 F.3d at 950.

■ To begin with, the precise injury at stake in this action is the IBIA's very refusal to hear the merits of Plaintiffs' appeal. *See Bensman v. United States Forest Service*, 408 F.3d 945, 950 (7th Cir. 2005) ("[t]he injury that they assert is the [agency's] refusal to hear those appeals."). That is not the same as whether on the

**5.** An association has standing to bring a suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation of the individual members. *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

merits the IBIA should have reversed the BIA's approval of the Tribe's application. In essence, Plaintiffs claim they have right to participate in the administrative appeals process, as provided by the regulations cited in the BIA's Notice of Decision. In their original briefs, to be sure, the parties relied on principles of judicial standing in analyzing Plaintiffs' standing to seek redress under the NEPA and IRA. However, now Plaintiffs do not seek judicial review of whether the BIA's trust acquisition decision was reached in violation of NEPA and IRA; they simply want to have the IBIA address the merits of their position on those questions. Therefore, any standing inquiry must proceed from the premise that the only injury at stake is to Plaintiffs' claimed procedural right to have the IBIA consider their administrative appeal.

## B. Injury In Fact

■ Plaintiffs have shown that they have suffered a procedural injury in the IBIA's refusal to hear their appeals. However, for Article III purposes, a procedural injury is cognizable only if "the plaintiff also asserts a 'concrete interest' that is threatened by the failure to comply with that requirement." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004).

■ In this case, the declarations submitted by Plaintiffs establish that certain of their members have concrete environmental and economic interests. The evidence indicates that the Tribe's existing development already has contributed to a decline in air, water and soil quality and an increase in traffic and crime. The evidence also shows that the Tribe's proposed development is adjacent to a LUST site that some declarants believe may lead to MBTE contamination of the water supply. Finally, the declarants have shown that they live sufficiently close to the proposed development that they are likely to suffer

the environmental consequences that may ensue. Together, this evidence shows that at least some of Plaintiffs' members have a concrete interest that is threatened by the IBIA's failure to address the merits of their appeal. *See Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir.2001) (plaintiffs have a "concrete interest" if there is a "geographic nexus between the individual asserting the claim and the location suffering an environmental impact.") (internal quotation and citation omitted); *see also Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.") (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)).

Federal Defendants do not dispute that aesthetic, recreational and other quality of life values affected by the physical environment are cognizable injuries-in-fact under Article III or that the declarants who asserted such injuries have the required geographic nexus. *See Friends of the Earth*, 528 U.S. at 183–84, 120 S.Ct. 693 (affidavits of organization's members demonstrated effects of defendant's pollution on their recreational, aesthetic and economic interests); *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir.2000) (concluding that injury in fact established where evidence is "sufficient to make credible the contention that the [plaintiff] ... really has or will suffer in his or her degree of aesthetic or recreational satisfaction ... if the area in question remains or becomes environmentally degraded").

Instead, Federal Defendants contend that the economic injuries claimed by

Bowen and Hamer are highly speculative. They direct their argument primarily toward Bowen, who provided a lengthy account of the economic impact he believes trust status has on non-tribe businesses—namely that the Tribe's plans to offer commercial and retail space using its tax-exempt status will place non-tribe businesses, such as his commercial property rental business, at a competitive disadvantage. Bowen Decl. ¶ 3. In disputing Bowen's account, the Federal Defendants actually part ways with the IBIA, which acknowledged that Bowen probably did state a sufficiently concrete and imminent economic injury. *Santa Ynez I*, 42 IBIA at 198–99.

▇▇▇ The Court agrees with the IBIA's assumption that Bowen does state a sufficient economic injury. Bowen owns a three-story building containing 15,000 square feet of commercial and retail space. Bowen Decl. ¶ 4. It is located 500 yards from the Tribe's proposed commercial building. *Id.* ¶ 7. The Tribe has proposed a 27,600–square foot, two-story commercial retail building. *Santa Ynez I*, 42 IBIA at 190–91, 200. According to Bowen's declaration, the Tribe is exempt from property taxes, corporate income taxes, and taxes on construction materials, and it is not subject to other regulatory burdens, such as the requirement that it carry liability insurance. Bowen Decl. ¶ 7. Given the proximity of Bowen's building to the Tribe's proposed building, the fact that they will both be renting to business tenants, and the fact that the Tribe will not be subject to most of the state and local regulatory and tax requirements that Bowen is subject to, the Court finds that Bowen has sufficiently established that he has a concrete interest at stake in this case.

**C. Causation and Redressability**

The parties have focused on whether the environmental, aesthetic, and economic im-

pacts of. which Plaintiffs' members complain are "fairly traceable" to the BIA's approval of the trust and whether, as the IBIA concluded, these impacts could not be redressed because "the Tribe's development could almost certainly proceed whether or not the Property is taken into trust." 42 IBIA 199. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

▇▇▇ Given that the relief Plaintiffs seek in this action is merely the opportunity to present to the IBIA the merits of their challenge to the BIA's decision, causation and redressability are not real issues. At this stage, Plaintiffs need not establish that the BIA would have reached a different conclusion had they been allowed to have the merits of their appeal decided by the IBIA or even that the IBIA would in fact reach a different conclusion regarding their standing. *See Lujan*, 504 U.S. at 572 & n. 7, 112 S.Ct. 2130 (observing that plaintiffs "seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs" can establish standing "without meeting all the normal standards for redressability and immediacy.") Indisputably the injury to Plaintiffs' alleged right to an administrative appeal is fairly traceable to the IBIA Order, and a court decision vacating the IBIA's ruling on standing *could* redress that injury.

**D. Prudential Standing**

▇▇▇ The Administrative Procedure Act provides that "a person ... adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court has interpreted this provision as imposing a prudential standing requirement that "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regu-

lated by the statute ... in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). "The zone of interests test is not intended to impose an onerous burden on the plaintiff." *See Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). "The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 399–400, 107 S.Ct. 750. But when, as here, the plaintiff is not "the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 399, 107 S.Ct. 750.

The parties' briefing before this Court focused on whether the IBIA correctly assessed Plaintiffs' prudential standing in light of the zone of interests of the NEPA and IRA. However, the Court need not decide whether Plaintiffs have prudential standing to challenge the BIA's trust acquisition decision under those statutes. Rather, the question is whether Plaintiffs have prudential standing to challenge the IBIA's decision regarding standing in this Court.

The Ninth Circuit faced a similar question in *Stock West Corp. v. Lujan,* 982 F.2d 1389 (9th Cir.1993), where it held that plaintiff did have prudential standing to challenge judicially a decision of the IBIA that plaintiff's administrative appeal to the IBIA was untimely and therefore barred. The district court had held that under 25 U.S.C. § 81, which requires BIA approval of certain contracts entered into by Indian tribes, plaintiff lacked prudential standing to sue in federal court. The Court of Appeals reversed, noting that the question was not whether plaintiff had prudential

standing to challenge the BIA's decisions under 25 U.S.C. § 81, but rather whether the plaintiff had prudential standing to challenge the IBIA's ruling that its administrative appeal was untimely. *Id.* at 1396–97. Thus, the court only needed to consider "whether Stock West has been subject to the agency's rules governing administrative appeals ... in a manner which permits [it] to challenge these regulations." *Id.* at 1396. The court answered this question in the affirmative:

> Stock West's interest in obtaining administrative review of the BIA Area Director's decisions is directly affected by the agency action at issue here, *i.e.,* the IBIA's decision that the appeal was untimely. Due to Interior Department rules regarding appeals to the IBIA, and the agency's interpretation and application thereof, Stock West is stymied in its efforts to avoid having its contracts with the Tribe nullified.

*Id.* at 1396–97.

 For purposes of Plaintiffs' standing before this Court, *Stock West* controls the analysis. As in *Stock West,* the issue before this Court is not whether Plaintiffs have prudential standing under the NEPA or IRA, the statutes on which they base their merits claims before the IBIA, but whether they have "an interest directly regulated by the agency action in question." *Id.* at 1397. Here, as in *Stock West,* IBIA applied its rules concerning administrative appeals to Plaintiffs in a way that prevented them from obtaining administrative review of the merits of the BIA's decision. As such, Plaintiffs unquestionably have "an interest directly regulated by the agency action in question." *Id.* at 1397. Therefore, Plaintiffs have prudential standing to challenge the IBIA's refusal to hear the merits of the administrative appeal. Accordingly,

POLO and POSY have standing to seek judicial review.

## IV. REVIEW OF IBIA ORDER

### A. Standard of Review Under the Administrative Procedure Act

 Plaintiffs challenge the IBIA's refusal to hear the merits of their appeal as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Known as the "arbitrary and capricious" standard, section 706(2)(A) allows a court to set aside an agency action if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). This inquiry must "be searching and careful," *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), but "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856. Nevertheless, "the agency must examine the relevant data and articulate a satisfactory explanation" for its decision and, "[i]n reviewing that explanation, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error in judgment." *Id.* (quotation and citation omitted).[6]

### B. The IBIA Failed to Account for Its Application of Judicial Standing Principles

For the reasons stated below and those set forth in the Court's order dated May 13, 2008, the Court holds that the IBIA's dismissal of Plaintiffs' appeal failed to meet the "arbitrary and capricious" standard of review under APA § 706(2)(A).

The starting point for the Court's review of the 1B1A Order is the language of the statutes and regulations that provide for an administrative hearing, appeal or intervention. Title 43, section 4.331 of the Code of Federal Regulations provides, in relevant part: "Any interested party affected by a final administrative action or decision of an official of the Bureau of Indian Affairs issued under regulations in Title 25 of the Code of Federal Regulations may appeal to the Board of Indian Appeals." An "interested party" is defined as "any person whose interests could be adversely affected by a decision in an appeal." 25 C.F.R. § 2.2. There is no question that these regulations are binding on the BIA and IBIA. As Plaintiff stresses, the BIA even attached a copy of the chapter containing section 4.331 to its Notice of Decision.

 In their supplemental brief, Federal Defendants urge the Court to defer to the IBIA's ruling on standing. Citing *Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n,* 194 F.3d 72 (D.C.Cir.1999), Federal Defendants argue that *Chevron* deference is warranted. But *Chevron* applies only to an agency's statutory interpretations. (In *Envirocare,* the Nuclear

---

**6.** Plaintiffs incorrectly contend that the Court must review the IBIA Order *de novo.* Courts of appeals do review lower courts' analysis of judicial standing *qua* judicial standing using a *de novo* standard, *see Hall v. Norton,* 266 F.3d 969, 975 (9th Cir.2001) (citation omitted), but this case involves judicial review of an agency decision about administrative standing.

Regulatory Commission was interpreting the right of appeal contained in a statute.) A different line of cases stemming from *Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), applies to an agency's interpretation of its own regulations. Although the IBIA did carefully and clearly explain its application of judicial standing, in neither its first or second orders did it construe or even mention its own regulations, 43 C.F.R. § 4.331 and 25 C.F.R. § 2.2.[7]

 Even assuming that the IBIA construed its own regulations to import judicial standing principles, such a construction would not necessarily command deference. As set forth in *Auer v. Robbins*, 519 U.S. 452, 463, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) and as clarified in *Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), although courts will defer to an agency's construction of a regulation that is ambiguous, deference is not required when the agency's interpretation is inconsistent with the plain language of the regulation itself, conflicts with agency intent at the time of promulgation, or exceeds the statute's limits.

Under the standards of *Auer* and its progeny, the IBIA's decision to limit standing to only those who can meet the requirements for judicial standing is difficult to square with the plain language of its very broad and permissive regulations on standing. Taken together, 43 C.F.R. § 4.331 and 25 C.F.R. § 2.2 confer appellate standing on anyone "whose interests could be adversely affected by a decision." *See Koniag, Inc., Village of Uyak v. Andrus*, 580 F.2d 601, 614 (D.C.Cir.1978) ("Such a general and indefinite provision [as 43 C.F.R. § 4.331] suggests no concrete standards for determining who should have standing to appeal."). Examining a similarly worded statute governing the right of intervention in Nuclear Regulatory Commission proceedings, the D.C. Circuit characterized the word "interest" as "scarcely self-defining." *Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n*, 194 F.3d 72, 76 (D.C.Cir.1999). Citing various judicial opinions about standing, the *Envirocare* court noted that "interest" could mean, "an academic or organizational interest in a problem," "an interest in avoiding economic harm or in gaining an economic benefit from agency directed at others" or an interest in "aesthetic, conservational and recreational values." *Id.* (Internal quotations and citations omitted).[8]

The IBIA's reliance on judicial standing principles also appears inconsistent not only with the plain language of its regulations but with the agency's intent. When the Department of the Interior promulgated the current version of section 4.331 in 1989, it *removed* restrictive language from the previous version in order to make section 4.331 consistent with its companion regulation at 25 C.F.R. § 2.2. *See* 54 Fed. Reg. 6483–01 (Feb. 10, 1989). The previous language of section 4.331 is telling for what it reveals about the current provision.

7. In its post-remand order, *Santa Ynez II*, the IBIA wrote that the Regional Director's solicitation of public comment letters "does not create legal standing under a statute or regulation where it does not otherwise exist." *Santa Ynez II*, 45 IBIA 115. This was not a reference to standing under the agency's regulations. Rather, it was commentary on whether appellants were within the legal zone of interests of the NEPA and IRA, in the context of Article III prudential standing.

8. The court also observed, however, that these judicial opinions do not provide definitive insight into the meaning of "interest" in the statute governing the right of intervention in Nuclear Regulatory Commission proceedings. *See id.* ("But whatever he judicial mind thinks of today as an 'interest' affected by a proceeding is not necessarily what Congress meant when it enacted this provision in 1954.")

Prior to 1989, section 4.331 provided a right of appeal to "any interested party affected by a final administrative action or decision . . . protested as a violation of a right or privilege of the appellant." *Hawley Lake Homeowners' Ass'n v. Deputy Assistant Sec'y*, 13 IBIA 276, 284 (1985); *see also Redfield v. Acting Deputy Assistant Sec'y*, 9 IBIA 174, 176 (1982) (citing 43 C.F.R. § 4.331 (1981), 41 Fed. Reg. 7337 (Jan. 23, 1981)). That formulation was based on a version of 25 C.F.R. § 2.2 that provided that an appeal may be taken from an action or decision of a BIA official "where the action or decision is protested as a violation of a right or privilege of the appellant. Such rights or privileges must be based upon fundamental constitutional law, applicable Federal statutes, treaties, or upon Departmental regulations." *Hawley Lake*, 13 IBIA at 284 (citing 25 C.F.R. § 2.2). The regulations further defined "right" as "a favorable position in a legal relationship, the continued enjoyment of which may not be withdrawn save by a change in fundamental constitutional law" and "privilege" as "a favorable position in a legal relationship, the continued enjoyment of which may be withdrawn only upon a change in law, statute or regulations upon which the relationship is based." *Hawley Lake*, 13 IBIA at 284 (citing 25 C.F.R. § 2.1(f), (g)).

Such restrictive language for standing was very similar to Article III restrictions, according to the IBIA's analysis in *Hawley Lake*. In that decision the IBIA explained the requirement of an adversely affected "legally protected interest" in reference to the Supreme Court's explanation—in 1939—that a legal right is "one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." *Hawley Lake*, 13 IBIA at 284 (citing *Tennessee Elec. Power Co. v. TVA*, 306 U.S. 118, 137–38, 59 S.Ct. 366, 83 L.Ed. 543 (1939)). Hence, the IBIA drew upon "the similarity between Article III restrictions and its own authorizing regulations in the context of standing" in order to define standing under previous version of section 4.331. *Estate of Mary Dodge Peshlakai v. Area Dir.*, 15 IBIA 24, 33 (1986) (citing *Hawley Lake* ).[9]

Whereas the previous text of section 4.331 was similar to the Supreme Court's language regarding judicial standing in *Tennessee Elec. Power Co.*, the current text of section 4.331 does not contain a comparable linguistic similarity to the constitutional and prudential standards articulated in *Lujan* and later cases. The current version of section 4.331 no longer contains the "right or privilege" language, leaving only the general requirement that the appellant be an "interested party." Similarly, the current version of 25 C.F.R. § 2.2 also no longer limits standing to those who protest a violation of "rights or privileges . . . based upon fundamental constitutional law, applicable Federal statutes, treaties, or upon Departmental regulations." Rather, it affords standing to "any person whose interests could be adversely affected." In light of this history and the broad language of these regulations, the IBIA's "interpretation," which simply imports judicial standing "as a mat-

9. In the decades since the Supreme Court decided *Tennessee Elec. Power Co.*, "[judicial] standing barriers have been substantially lowered." *United States v. Richardson*, 418 U.S. 166, 193, 94 S.Ct. 2940, 2954, 41 L.Ed.2d 678 (1974) (Powell, J., concurring); *see also Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (criticizing the so-called "legal interest test" as overly conducive to blending issues of standing with the merits of the claim). Given that by 1985 *Tennessee Elec. Power Co.* had been cited disapprovingly, it is difficult to regard *Hawley Lake's* citation to *Tennessee Elec. Power Co.* as accurately applying the judicial standing principles of the day.

ter of prudence," *Santa Ynez I*, 42 IBIA 192, does not deserve deference under the *Auer* standard. *Cf. Auer*, 519 U.S. at 461, 117 S.Ct. 905 (upholding the Secretary of Labor's interpretation of his own regulation because it was not inconsistent with the plain language of the regulation).

In an effort to fill the gap left by the IBIA, Federal Defendants point to a number of cases in which the IBIA has stated that it "has a well-established practice of adhering to those jurisdictional constraints as a matter of prudence to further administrative economy." *LeCompte v. Acting Great Plains Reg'l Dir.*, 45 IBIA 135, 146 (2007) (citing *Quantum Entm't Ltd. v. Acting Southwest Reg'l Dir.*, 44 IBIA 178, 188 n. 12 (2007).) Those decisions, like the IBIA's rulings here, do not even refer to the Department of Interior regulations governing appeals. Courts that have deferred to an agency's judgment about the need to promote administrative economy— *i.e.*, conserve resources—have done so because the agency explained its priority-setting and resource allocation processes. *See, e.g., Intercity Transp. Co. v. U.S.*, 737 F.2d 103, 110 (D.C.Cir.1984) (agency's refusal to grant declaratory relief was not arbitrary or capricious where it made a judgment that such remedy would be an imprudent and inefficient allocation of agency resources and where it articulated coherently those circumstances where it considers the institution of declaratory order proceedings to be appropriate). Even if an agency's decision on standing may legitimately be based on the need to conserve agency resources, the IBIA rulings that Federal Defendants cite provide nothing to support their bare assertion about promoting administrative economy.

Nonetheless, given the generally applicable deferential standard of review required by section 706(2)(A) of the APA, the Court has independently undertaken an extensive review of the IBIA case law to determine whether the IBIA previously provided an interpretation of 43 C.F.R. § 4.331 or 25 C.F.R. § 2.2 or a functional and pragmatic explanation for its application of standing requirements, one that could apply to this case. The Court was guided by Judge Bazelon's suggestion in *Koniag* that a functional analysis of administrative standing is appropriate, where the governing regulation is as general as 43 C.F.R. § 4.331. "Such an analysis would examine the nature of the asserted interest, the relationship of [the proponent of standing's] interest to the functions of the agency, and whether an award of standing would contribute to the attainment of these functions." *Koniag, Inc., Village of Uyak v. Andrus*, 580 F.2d 601, 614–15 (D.C.Cir.1978). Judge Bazelon outlined five factors that would go into a functional analysis:

(1) The nature of the interest asserted by the potential participant.

(2) The relevance of this interest to the goals and purposes of the agency.

(3) The qualifications of the potential participant to represent this interest.

(4) Whether other persons could be expected to represent adequately this interest.

(5) Whether special considerations indicate that an award of standing would not be in the public interest.

*Koniag*, 580 F.2d at 616.

Unfortunately, none of the IBIA decisions the Court has reviewed interprets the regulations or provides any functional explanation. The cases the IBIA cited in the orders at issue here relied on the same language it used in this case: "As a prudent matter, the Board limits its jurisdiction to cases in which an appellant can show standing, even though the Board is not bound by the case or controversy restriction in Article III of the United States Constitution, applicable to federal courts."

*Citizens for Safety and Environment v. Acting Northwest Reg'l Dir.*, 40 IBIA 87, 92 (2004) (cited at *Santa Ynez I*, 42 IBIA at 192); *Arizona State Land Dep't v. Western Reg'l Dir.*, 43 IBIA 158, 163 (2006) (cited in *Santa Ynez II*, 45 IBIA at 1000). The Court has located three additional decisions in which the IBIA docs explicitly cite the current (post–1989) version of section 4.331, but they do not provide any interpretation that could apply to this case. Two of those decisions summarily dealt with whether unincorporated groups were "interested parties" under 25 C.F.R. § 2.2. *See Reindeer Herders Ass'n v. Juneau Area Dir.*, 23 IBIA 28, 44 (1992); *Noyo River Indian Community v. Acting Sacramento Area Dir.*, 19 IBIA 63, 65 (1990). The third case simply stated in a footnote that a Ph.D. student who had done research on the appellant tribe and who had written a letter to the Board in connection with an appeal was not an "interested party." *White Earth Band of Chippewa Indians v. Minneapolis Area Dir.*, 23 IBIA 216, 227 n. 1 (1993). None of these three cases involved appeals from BIA trust acquisition decisions.[10]

In the only IBIA case the Court found that discussed the phrase "interested party" in 25 C.F.R. § 2.2, the IBIA merely observed that section 2.2 was broader than 25 C.F.R. § 163.33. *See Van Mechelen v. Acting Portland Area Dir.*, 34 IBIA 202, 203 n. 2 (2000). Section 163.33 restricted standing to appeal BIA approvals of commercial contracts to "any person whose own direct economic interest is adversely affected by an action or decision." 25

C.F.R. § 163.33. The IBIA explained that the "regulation drafters ... intended by this provision to establish a tighter standing requirement than is included in the present version of 25 C.F.R. Part 2, BIA's general appeal regulations." *Van Mechelen*, 34 IBIA at 203 n. 2. Although *Van Mechelen* does not provide a controlling standard for determining who is an "interested party" for purposes of challenging a BIA trust acquisition decision, it does reinforce the proposition that the standard is meant to be relatively broad.

Finally, the Court has reviewed *Evitt v. Acting Pacific Reg'l Dir.*, 38 IBIA 77 (2002), a trust acquisition decision that the IBIA has cited several times in its case law and that Federal Defendants cite also. In *Evitt*, several individuals who lived in the vicinity of the subject property in Amador County, California appealed a decision of the BIA Regional Director to take the land into trust for a tribe. *Id.* at 77. The IBIA dismissed their appeal based on reasoning similar to that in the IBIA Order in this case. Applying the standard of *Lujan*, the IBIA concluded that the appellants did not have standing because they did not show that tribe could not proceed with its development plans without trust status. *Id.* at 81–82. But once again, the IBIA did not cite the applicable regulations, although it reviewed its own case law in a general manner:

> In previous Board cases, appellants have been found to lack standing where they failed to show they had suffered a "legal wrong," *Utah v. Acting Phoenix Area*

**10.** The court located one IBIA decision involving a trust acquisition in which the BIA decision being reviewed specifically referred to the definition of "interested party" in 25 C.F.R. § 2.2, but the IBIA ruling did not mention that regulation or incorporate the BIA's discussion of that regulation. *See Shawano County Concerned Property Taxpayers Ass'n v. Midwest Reg'l Dir.*, 38 IBIA 156, 157

(2002). In reviewing the Regional Director's decision, the IBIA applied Article III principles of standing before the IBIA to standing before a BIA Regional Director, but did not cite or discuss the regulation concerning "interested parties." *See id.* (stating that the Board relies on *Lujan* in addressing the standing of private individuals and association challenging trust acquisition decisions).

*Director,* 32 IBIA 169, 176 (1998), or to show that the decision on appeal adversely affected the appellants' enjoyment of a legally protected interest. *Hawley Lake Homeowners' Ass'n v. Deputy Assistant Secretary–Indian Affairs (Operations),* 13 IBIA 276, 284 (1985); *Redfield v. Acting Deputy Assistant Secretary–Indian Affairs (Operations),* 9 IBIA 174, 175 (1982). In addressing standing, the Board has been guided by the standing analysis employed in the Federal courts, even though the Board is not bound by the case-or-controversy restrictions in Article III of the United States Constitution. [Citations omitted.]

*Evitt,* 38 IBIA at 79. Like the other cases reviewed above, *Evitt* does not explain why the IBIA relied on judicial standing. Moreover, *Evitt* cites *Hawley Lake* and *Redfield* without acknowledging that those decisions relied on the pre–1989 regulations and outdated principles of judicial standing. *See supra* note 11. Thus, *Evitt* does not persuade the Court that the IBIA was correct in using judicial standing principles to assess Plaintiffs' standing to challenge trust acquisition decisions or even that the IBIA correctly applied judicial standing principles.

 The IBIA has applied judicial standing principles for many years. Federal Defendants suggest the Court should defer to this longstanding practice. The longstanding practice of an agency, as reflected in agency rulings, interpretations and opinions, "while not controlling upon the courts by reason of their authority, do constitute body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). However, the weight the Court is to afford the IBIA's longstanding practice depends on "the thoroughness evident in its consideration, the validity of its reasoning, its con-

sistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* In this case, the IBIA's case law reflects a longstanding practice of relying on, or at least invoking, judicial standing principles of "legal wrong," constitutional standing and prudential standing, without explaining why it has adopted those Article III restrictions in the face of a markedly looser standard in 43 C.F.R. § 4.331 and 25 C.F.R. § 2.2. Therefore, the mere fact that the IBIA has purported to rely on judicial standing principles for many years does not allow the Court to conclude that it articulated a "satisfactory explanation" based on the relevant factors. *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Nor, contrary to Federal Defendants' contention, does *Envirocare* allow, much less require, the Court to approve the IBIA Order. *See Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n,* 194 F.3d 72 (D.C.Cir.1999) Indeed, that decision indicates that the opposite conclusion is in order. In *Envirocare,* the D.C. Circuit affirmed the Nuclear Regulatory Commission's standard for administrative standing, which was more restrictive than judicial standards. *Envirocare,* 194 F.3d at 78. It did so because the Commission articulated specific reasons based on its own responsibilities and functions and on the purposes of its enabling statute and the statute governing the decision that was being challenged. *See Envirocare,* 194 F.3d at 76–78 (noting the reasons provided by the Nuclear Regulatory Commission support its interpretation of statute to deny standing to competitors asserting economic injury). The D.C. Circuit emphasized that "the Commission made explicit its view that judicial standing doctrines were not controlling in the

administrative context and that its duty was to interpret the 'interest[s]' Congress intended to recognize in § 2239(a)(1)(A): 'Our understanding of the [Atomic Energy Act] requires us to insist that a competitor's pecuniary aim of imposing additional regulatory restrictions or burdens on fellow market participants does not fall within those 'interests' that trigger a right to hearing and intervention under [§ 2239(a)(1)(A) ].' " *Id.* at 78 (quoting *International Uranium Corp.*, 48 N.R.C. 259, 264, 1998 WL 850192 (1998)). If anything, *Envirocare* illustrates that the real question here is whether the IBIA provided a sufficient explanation for its conclusion regarding Plaintiffs' administrative standing, in light of 43 C.F.R. § 4.331 and 25 C.F.R. § 2.2. And the answer to that question is "no," because the IBIA ignored those provisions altogether and simply announced that it was using judicial standing principles.

The IBIA's action is erroneous under the APA not merely because it applied principles of judicial standing or concluded that Plaintiffs lacked standing; its error was in apparently assuming, without any explanation, that the concepts rooted in constitutional and prudential limitations on federal courts should be applied without regard to the IBIA's regulations. In this regard, then, the IBIA "entirely failed to consider an important aspect of the problem[,]" *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856, given that those regulations invite analysis of the nature of Plaintiffs' asserted interests, the relationship of their interests to the functions of the agency, and whether granting standing would aid the agency's fulfillment of its functions. *See Koniag, Inc., Village of Uyak v. Andrus,* 580 F.2d 601, 614–15 (D.C.Cir.1978). Although the IBIA has "broad discretion in formulating both substantive policies and procedural rules," *Koniag,* 580 F.2d at 613, the APA requires that it "examine the relevant data and

articulate a satisfactory explanation." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856. The IBIA's failure to examine factors that may be relevant under its regulations, such as those just mentioned, and its failure to provide the requisite explanation leave the Court no choice but to vacate its decision and remand the matter for further consideration.

Contrary to Federal Defendants' apparent concerns, in remanding this matter to the IBIA, this Court is *not* requiring the IBIA to take a more lenient approach to standing. Indeed, to do so would contravene established principles of judicial review of administrative action. *See Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 543–49, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (holding that courts may not impose any procedures on an agency when a statute does not require them). Congress placed the procedural requirements pertaining to administrative proceedings primarily in the hands of the agency, which is uniquely positioned to consider how such standards should be fashioned to best enable it to fulfill its mission and achieve the purposes of the statutes it enforces. That is why the Court is not directing the IBIA to reach a different result, but instead to render a decision on Plaintiffs' standing that specifically accounts for its regulations governing administrative appeal and any other factors that it deems relevant to the determination of standing. *See INS v. Orlando Ventura,* 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) ("Generally speaking, a court ... should remand a case to an agency for decision of a matter that stat-

utes place primarily in agency hands.") The IBIA Order, despite its extensive analysis, clearly does not accomplish this. *See Fla. Power & Light Co.*, 470 U.S. at 744, 105 S.Ct. 1598 ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course in most cases is to remand to the agency for additional investigation or explanation.")

■■■ For their part, in their supplemental brief Plaintiffs offer several legal arguments why the Court should not remand to the IBIA for further consideration of standing, but instead rule that they do have standing. The cases they cite do not support the conclusion that remand is inappropriate in this case. More importantly, this Court is not empowered to decide the administrative standing issue *de novo*, regardless whether the IBIA will likely reach the same result. *See Vermont Yankee*, 435 U.S. at 549, 98 S.Ct. 1197 (1978) (courts may not impose on an agency any procedural rules which a statute does not require, but instead may only review the rules by the appropriate standard of review); *BizCapital Business & Indus. Dev. Corp. v. Comptroller of the Currency of the U.S.*, 467 F.3d 871, 874 (5th Cir.2006) (that the agency is likely to reach the same result after properly applying its regulations does not render remand a mere formality).

## V. CONCLUSION

For the foregoing reasons, the Court VACATES the IBIA Order and REMANDS the case to the IBIA for further consideration consistent with this ruling.[11]

11. Docket No. 66.

No hearing is necessary. Fed. R. Civ. P. 78: L.R. 7–15.

IT IS SO ORDERED.